R. H. TINKER *et al.*

*v.*

THOMAS D. CATLIN.

*Opinion filed October 26, 1903—Rehearing denied December 3, 1903.*

1. BILLS AND NOTES—*section 3 of Sureties act construed.* The term "principal maker" of a note, used in section 3 of the Sureties act, (Rev. Stat. 1874, p. 1049,) providing for the release of sureties in case of failure of the holder to present the claim for allowance in case the "principal maker" shall die, means the person who received the consideration for the note and who would have been the party to it in the absence of endorsers or sureties.

2. SAME—*sureties cannot bind holder by arrangement amongst themselves as to liability.* Sureties on a note cannot, by an arrangement amongst themselves, constitute each one but the last, with reference to the order of signing, a principal maker of the note, and thus compel the holder to follow, in the order agreed upon, the estate of each surety in case of death, on penalty of losing his debt or releasing the remaining sureties.

3. SAME—*rule as to status of endorsers of note.* Endorsement, before delivery, of a note payable to the order of the maker creates the obligation of a simple endorser, but if the note is payable to a specific person the endorsers become guarantors of payment.

*Tinker* v. *Catlin,* 102 Ill. App. 264, affirmed.

APPEAL from the Branch Appellate Court for the First District;—heard in that court on appeal from the Circuit Court of Cook county; the Hon. EDMUND W. BURKE, Judge, presiding.

This was a bill for injunction, filed by appellants, against appellee, in the circuit court of Cook county, August 3, 1894. A temporary injunction was granted, but on the hearing it was dissolved and the bill dismissed for want of equity. An appeal was prosecuted to the Appellate Court, where the decree of the circuit court was affirmed, and this appeal is prosecuted.

The bill alleged "that on April 6, 1891, the appellee, Thomas D. Catlin, commenced an action at law against appellants, Robert H. Tinker and F. G. Tibbits, and one

Sidney A. Stevens, in the superior court of Cook county, in assumpsit, to recover $40,000, alleged to be due to said Catlin upon a promissory note executed October 1, 1890, due and payable six months after date, for $34,290.05, said note being executed by Sidney A. Stevens and one Benjamin H. Campbell as principal makers and orators as sureties; that said note was signed by orators as sureties for the payment of the indebtedness which had prior thereto been contracted by Sidney A. Stevens and B. H. Campbell; that at the May term, 1891, of said superior court appellants appeared in said action at law and filed a plea in bar in said cause; that prior to the commencement of said suit at law, and on November 28, 1890, B. H. Campbell, one of the principal makers of said note, died, leaving an estate valued at about the sum of $70,000; that on the 6th day of February, 1891, Augustus S. Campbell was appointed executor of the estate of said B. H. Campbell, and said estate was finally closed and settled in the probate court of Cook county on December 30, 1893; that said Thomas D. Catlin did not, during the two years the estate of said B. H. Campbell was being probated, exhibit his claim against the said estate, as in law and equity he should have done and under the statute in such case made and provided he was compelled to do; that had the said Catlin presented his said claim to the probate court according to the provisions of the statute, the same would have been fully paid and discharged, as said estate was fully able to pay said claim and discharge the same in full had the same been presented within the two years; that prior to the time of the signing and execution of the note upon which said suit was brought, said B. H. Campbell and said Sidney A. Stevens executed their certain promissory note to the said Thomas D. Catlin; that to secure the payment of said note so executed by them, as aforesaid, the said Stevens and the said Campbell hypothecated with the said Catlin a large amount of the capital stock of various companies; that said note was

for the sum of $35,000, and was executed on or about the first day of April, 1888, payable to the order of Sidney A. Stevens, and was guaranteed by said Stevens and said Campbell, payable six months after date; that at the maturity of said note Stevens and Campbell did not pay the same but gave a renewal note therefor, which renewal note was dated October 1, 1888, for the same amount, payable one year after date, and that said Campbell and Stevens hypothecated with said note, as collateral security, the same stock as with the former note, together with additional stock, as orators are informed and believe; that the said Catlin, as orators were informed by Campbell at the time, wanted further personal security, and to obtain the same Campbell applied to orators to sign said note as sureties, at the same time assuring orators that he, said Campbell, and the said Stevens, had placed with said Catlin collateral security sufficient to take care of and discharge said note, and in case there was any failure in this respect, that he, said Campbell, would pay and take care of the same, so that orators would not be called upon, in any event, to pay said note; that their signatures were required for the sole purpose of pleasing the said Catlin, and not otherwise, as Campbell represented to orators that he was abundantly able to pay and discharge said note, which representation was true in substance and in fact, as at that time and at the time of the death of said Campbell he was worth more than half a million dollars, and was abundantly able to pay all his obligations, and able to discharge whatever obligations and claims were exhibited against his estate as provided by the statute; that the note sued on was a renewal note of the note given on the first day of April, 1888, as aforesaid, and at the time of the giving and signing thereof by orators the indebtedness specified and made payable was in fact the indebtedness of said Stevens and the said Campbell, and not of orators; that orators never received any consideration whatever on

account of the execution or the signing of said note; that the entire consideration of said note went to and was received by said Stevens and Campbell, and that orators were accommodation signers of said note, and not principals, and their liability on said note was that of sureties, and not otherwise; that Catlin, in not presenting and filing his claim in the probate court against the estate of said B. H. Campbell within two years allowed therefor, thereby discharged and released one of the principal makers and the only responsible maker of said note for the payment of said debt, and that in law and equity, and under the statute in such case made and provided, orators are likewise released and discharged; that at the commencement of said action orators had no knowledge whatever of the intention of Catlin to release the estate of Campbell from the payment of said indebtedness, and that while orators knew it was the duty of Catlin to file said claim in the probate court against the estate of said Campbell, they also knew and were advised that said Catlin had two years within which to file and present said claim, and therefore orators could not avail themselves of this defense in making defense to said action at law, and notwithstanding orators used all diligence in the defense of said action at law within their power, yet judgment was rendered against them and the said Sidney A. Stevens on the 8th day of June, 1891, for the sum of $18,169.93, from which judgment orators prosecuted an appeal to the Appellate Court, wherein, on the 4th day of March, 1892, said judgment was affirmed, from which said judgment of affirmance orators appealed to the Supreme Court, and the judgment of the Appellate Court was affirmed by the Supreme Court in a decision rendered and filed on the 19th day of June, 1894; that therefore orators were unable to interpose a defense to said action at law upon the ground that Catlin had released one of the principal makers of said note by failing to file his claim in the probate court against the estate

of said B. H. Campbell, as in equity and law he was compelled to do." The bill further alleges that execution had been issued upon the judgment so obtained against orators and was in the hands of James H. Gilbert, sheriff of Cook county, to execute; that Stevens, one of the principal makers of said note, was insolvent and had no property subject to execution. Prayer was, to require the defendants in the bill to answer without oath, and that the judgment so rendered against orators may be set aside and vacated, so far as they are interested therein and are liable thereunder, and that a temporary injunction be granted restraining Catlin, and Gilbert, the sheriff, from enforcing the collection of the judgment pending the suit, and that on the final hearing the injunction be made perpetual, and for general relief.

Afterwards appellants amended their bill by alleging that upon the appeals prosecuted to the Appellate and Supreme Courts from the judgment at law they had executed certain appeal bonds, in which orators appeared as principal makers and one Charles C. Heisen and one George H. Cormack are sureties, and amended the prayer, asking for an injunction restraining the collection and prosecution of the suit at law, or otherwise, upon said appeal bonds. Afterwards, in June, 1899, appellants further amended their bill by striking out the prayer and adding the further allegation, "that while they were and are mere sureties to and for the said Campbell upon the said renewal note of October 1, 1888, mentioned and described in the bill of complaint, and that as to them said Campbell was the principal maker of said note, and while said Catlin had at all times full and actual knowledge and notice of the character of the liability of orators, yet said Catlin wholly failed and neglected to institute any proceedings or take any steps of any kind against said Campbell, or his heirs or personal representatives, estate or property, to enforce the payment of said indebtedness, and instead of thus enforcing the prior and

primary liability of said Campbell and his personal representatives, said Catlin is seeking to compel orators to pay said note, and gives out that he will cast the entire burden of the payment of said note upon orators and wholly release and discharge the personal representatives and heirs of said Campbell."

The bill then sets out the names of the heirs-at-law and devisees of said B. H. Campbell, and avers that they received from him and his estate real estate amounting to $100,000 and personal property to the value of $100,000, of which properties they became the absolute and unconditional owners by virtue of their heirship, and asks to make them parties defendant to the bill, and to require Catlin to proceed against them and require the heirs of said Campbell to make discovery of the estate, real and personal, that came to them as such heirs, and avers it is the duty of Catlin to collect said indebtedness from the heirs and devisees of said Campbell, and the duty of said heirs and devisees to pay said indebtedness and exonerate orators. The bill contains the further allegation, "that on information and belief, and some time after the maturity of the note of October 1, 1888, the exact date being unknown to orators, said Catlin promised and agreed to and with the personal representatives and heirs of said Campbell to wholly release and discharge the estate and heirs of said Campbell from all obligation and liability upon said note, and did promise and agree not to institute any proceeding of any kind or character against the personal representatives, heirs or devisees of said Campbell to compel the payment of said indebtedness or any part thereof; that orators are unable to say whether the agreement was verbal or in writing, or the exact date thereof, or the consideration upon which the same was based, and charge that under and in pursuance of said agreement Catlin had wholly failed and refused to take any steps to procure the indebtedness from Campbell or said personal representatives, heirs or

devisees; that having no knowledge of such facts, orators were during the pendency of the suit at law unable to avail themselves of such matters as a defense in law to the action, as they had learned of the matters and agreement therein set forth within the last ten days."

This amendment was made June 15, 1899. The prayer was amended, requiring that all the defendants answer without oath, and that the judgment should be set aside and vacated so far as it related to orators; that the sheriff and said Catlin be restrained from collecting or attempting to enforce the collection of said judgment; that the injunction be made perpetual; that the heirs and devisees of Campbell be required to pay the indebtedness and relieve orators, and for general relief.

To the bill as it existed before the last amendment Catlin filed a plea, averring that while all the makers of the promissory note for $34,290.05, mentioned in said bill, became, by said note, jointly and severally liable upon said note to defendant, Catlin, apparently as principal makers thereof, yet said Sidney A. Stevens, mentioned in the said bill, was, as to the other signers and makers of said note, the principal debtor upon and maker of said note, and the other three makers of said note were all sureties for and signed said bond at the request of and for the benefit of said Stevens; that said B. H. Campbell was, equally with said complainants, a surety for Sidney A. Stevens, mentioned in said bill of complaint as amended, with respect to said note; that said B. H. Campbell was liable upon said note as surety for said Stevens, and not otherwise; and avers that said Stevens was, as between himself and the other makers of said note, the only principal maker of said note.

After the last amendment Catlin answered so much of the bill as related to the last amendment, and admitted that he did not institute any proceeding or take any steps against said Campbell, or his heirs or personal representatives; denied that he threatened or had given

out that he had or would cast the entire burden of said note upon the complainants and wholly release and discharge the personal representatives and heirs of said Campbell; denied that Campbell was a principal in said note or liable before the complainants; denied that he at any time agreed to release and wholly discharge the estate and heirs of Campbell from all obligation and liability upon said note; denied that he did, at any time, promise not to institute any proceeding of any kind and character against the personal representatives, heirs and devisees of said Campbell in order to compel payment of said indebtedness.

The Campbell heirs and devisees filed answer, and replication was filed, and the cause was heard and the bill dismissed. As to so much of the decree as dismissed the bill, and prayer thereof asking for relief against the heirs and devisees of Campbell, no error was assigned or insisted upon either in the Appellate Court or this court, and need not be further noticed in the consideration of this case.

KRETZINGER, GALLAGHER & ROONEY, for appellants.

. BENTLEY & BURLING, for appellee.

Mr. JUSTICE RICKS delivered the opinion of the court:

The evidence discloses that the litigation in question is the result of the following business transactions: On August 14, 1885, Sidney A. Stevens, of Chicago, borrowed $15,000 of John R. Mitchell, and gave his note, due June 1, 1886, for the same. This note was endorsed by B. H. Campbell, and as collateral security for the payment of it Stevens gave to Mitchell fifteen shares Chicago Safe and Lock Company and one hundred and fifty shares Citizens' Gas Light and Heating Company of Bloomington, Illinois. This note was extended one year. The interest was paid to June 19, 1886, and $10,000 of the

principal paid October 27, 1886. On September 30, 1887, Sidney A. Stevens borrowed of one Kent $35,000, to pay the $5000 balance of the Mitchell note and for other purposes, and gave a note to the order of the maker, due in six months, which was endorsed by Sidney A. Stevens, B. H. Campbell and F. G. Tibbits, in the order named, and said Stevens placed with one Thomas D. Catlin, to secure said note, $6000 Kokomo gas seven per cent bonds; $3000 Consumers' Gas Company five per cent bonds; one hundred and fifty shares Citizens' Gas Light and Heating Company; one hundred shares Chicago Safe and Lock Company; thirty shares Commerce Vault Company; four hundred and sixty-five shares Chicago Mining and Reduction Company; sixty shares National Gas Light and Heating Company. The above note, payable to the order of Sidney A. Stevens, appears to have been taken up and exchanged for another note, dated September 30, 1887, for $35,000, due one year after date, payable to Thomas D. Catlin, which note was endorsed on the back, "F. G. Tibbits, B. H. Campbell," in the order named, and with which the same stocks as in the last note above mentioned were placed as collateral. The interest was paid on the last named note to October 1, 1888, and that note was renewed or taken up by the giving of another note payable to the order of Sidney A. Stevens, the maker, dated October 1, 1888, for $35,000, accompanied by the same collateral as mentioned in the two previous notes and endorsed by B. H. Campbell, F. G. Tibbits, R. H. Tinker, Sidney A. Stevens, and over their signatures, purporting to be for value, was a contract of guaranty. The note of October 1, 1888, was renewed January 1, 1890, by a note for $35,000, due in six months, signed by Sidney A. Stevens, and endorsed on the back by B. H. Campbell, F. G. Tibbits and R. H. Tinker, in the order named, and secured with the same collateral as above mentioned. The interest and a portion of the principal of this last note were paid by the sale and application

of some of the collateral, and on October 1, 1890, a new
note for $34,290.05 was given to Thomas D. Catlin, due
six months after date. This note purports to be a joint
note, and is as follows:

"$34,290.05.                    CHICAGO, *October 1, 1890.*

"Six months after date, for value received, we promise to
pay to the order of Thomas D. Catlin the sum of thirty-four
thousand two hundred ninety and 05/100 dollars at the Com-
mercial National Bank, with interest at the rate of seven per
cent per annum after date, having deposited with the holder
as collateral security." (Here then follows a list of the collat-
eral securities.)
                                    SIDNEY A. STEVENS,
                                    B. H. CAMPBELL,
                                    R. H. TINKER,
                                    F. G. TIBBITS."

Prior to the making of the last note in question, Cat-
lin, through his attorney, Towne, demanded payment
and refused a further extension, but it was finally agreed
that if all those who had formerly been endorsers up-
on the previous note would become makers of the note
in question, and $10,000 additional collateral security
should be placed with the note, the debt might be ex-
tended for six months more. Campbell, one of the par-
ties to the note, put up the $10,000 additional security
by pledging one hundred shares of the Northwestern
Safe and Trust Company stock.

The allegation of the bill that the indebtedness was
that of Sidney A. Stevens and B. H. Campbell, and that
Campbell, because of his relation to the debt, was an
original maker of the note, and as having received any
portion of the money for which the note was given, as a
loan, was abandoned after the evidence was all in, and
it was expressly stipulated by the parties "that Sidney
A. Stevens was a principal as to all the other signers,
namely, B. H. Campbell, R. H. Tinker and F. G. Tibbits,
and that each was entitled to exoneration from the said
Stevens." It may well be doubted whether there are
any allegations in the bill that would support any other

theory of the case than that which was expressed by the above stipulation. Appellants point out in their brief the following allegation: "Orators further charge and represent, that while they were and are mere sureties to and for the said B. H. Campbell upon the said renewal note of October 1, 1888, mentioned and described in this bill of complaint, and that as to the complainants the said B. H. Campbell was a principal maker of said note, and while the said Thomas D. Catlin had at all times full and actual knowledge and notice of the character of the liability of orators, yet the said Thomas D. Catlin wholly failed and neglected to institute any proceedings, or take any steps of any kind or character against the said B. H. Campbell, or his heirs or personal representatives, or estate or property, to enforce the payment of said indebtedness," etc. That allegation is not with reference to the note that was sued on, but was in regard to the note of 1888, which is therein designated as "said renewal note of October 1, 1888." After that note was given, at least two other notes were given with reference to and forming a part of this transaction, and the allegation, upon looking at the whole bill, was upon the theory of the relative position of the names of the endorsers upon the note of 1888. It is too well understood to need more than the mere statement, that the proofs must support the allegations of the bill, and that parties cannot have relief by making one case by their bill and another by their evidence. We are disposed, however, to consider the case upon its merits, accepting the view of counsel for appellants that the allegation above mentioned may be broad enough to authorize relief, if established by the evidence.

The duty of Thomas D. Catlin, if any, toward appellants arose from the statute, which is as follows: "Whenever the principal maker of any note, bond, bill or other instrument in writing shall die, if the creditor shall not, within two years after the granting of letters testament-

ary or of administration, present the same to the proper court for allowance, the sureties thereon shall be released from the payment thereof to the extent that the same might have been collected of such estate if presented in proper time; but this section shall not be construed to prevent the holder of any such instrument from proceeding against the sureties within said two years." (Hurd's Stat. 1899, chap. 132, sec. 3.) Unless appellants have brought themselves within the terms of this statute, it is apparent they are not entitled to the relief prayed, or any relief.

Appellants have admitted of record that B. H. Campbell was not a principal maker of the note in the ordinary acceptation of that term, and their position is, first, that B. H. Campbell promised and agreed with appellants that if they would go upon the note with him he would save them harmless, or would take up the note so owed by Stevens, and held out and entertained and expressed the opinion that the collaterals were ample security; second, that in the original notes, of which the note sued on and in question was a renewal, their names appeared in certain order with reference to the name of B. H. Campbell, or, in other words, that their names appeared under his name and that they were all endorsers, and that the liability was in the order of endorsement, and that the renewal notes did not in any manner change that liability.

With reference to the first position, it is our view that there is not a particle of evidence in this record to support the allegation in so far as it relates to appellant Tinker. The $35,000 was borrowed in 1887 and a note for that amount was executed, with Stevens as maker and Campbell and Tibbits as endorsers. R. H. Tinker was not a party to that note. It was not paid, but was renewed October 1, 1888, and Tinker appears on the note of October 1, 1888, for the first time in the transaction as an endorser. The manner in which Tinker became a

party to that note is stated by himself as follows: "I endorsed a note at the request of Sidney A. Stevens. Had a very brief conversation with him in reference to it. It occurred in the Commercial National Bank of Chicago. We met by chance at the entrance to the Commercial Bank as he was going in his office. I was going there also. I was not going to see him in reference to any business. I had had no conversation with him in reference to signing or endorsing the note, or with any one, and had received no letter. Mr. Stevens told me that he had a note, amply secured and amply endorsed, which was falling due, and the holder of the note desired him to give additional endorsement or security, and he asked me if I would be willing to endorse the note, and I looked at it and gave him my endorsement. I had not met Campbell and had no conversation with him before that time. I had no conversation with F. G. Tibbits in regard to the note before that time."

The next note signed by this witness was that of January 1, 1890, which was a renewal of the note just above mentioned, and of this Tinker says: "I remember signing note of January 1, 1890, described in that letter. I signed it at the request of Sidney A. Stevens. I think it was in the same form as the note of October 1, 1888, except in the matter of the change of date. I understood it to be a renewal. It was so represented to me by Sidney A. Stevens. I received no consideration for signing it. When I signed the second note the names of Campbell and Tibbits were on it. I had no conversation with Campbell or Tibbits before endorsing second note." As to the note sued on, Tinker said: "I signed that note in Towne's office, in Chicago. I went there with Sidney Stevens at his request. We met to effect a renewal. I don't remember of meeting Campbell at that meeting. Tibbits and I went together with Stevens. Nothing was said, except that Towne had arranged an extension,—that Catlin insisted upon our becoming makers instead of endorsers.

I signed this last note on that day. Towne asked for additional security, and I don't recall now what he suggested, but Campbell said he would add one hundred shares of some stock. He did add such collateral then and there. I received no consideration for signing this last note. Towne made the suggestion of having the note put in its present form. He was acting for Catlin. I received no consideration of any kind in this transaction from any one. There was no agreement, in writing or orally, with Campbell in reference to our liability between ourselves as to the debt. The matter was never talked over between us. There was no correspondence. I understood the last note was a renewal or extension of the former notes. The first time I met Campbell was at the signing of this last note. I don't recall any further conversation in reference to this transaction that occurred in the meeting in Towne's office in my presence and hearing. I was not present when this printed form of guaranty was stamped on the note of October 1, 1888. I had no talk with any one in reference to that. I never consented to having this put on there. I don't remember of ever having any conversation with Jamieson in reference to the transaction. My best recollection is that my only talk with Campbell is what occurred at that meeting in Towne's office. I don't know that I ever saw Campbell. I never had any conversation with him touching this subject."

From this explicit and clear statement of appellant Tinker it is apparent that there was no contract or agreement between him and Campbell other than that arising by operation of law from their endorsement and signatures to the various notes that were executed from time to time in this transaction. Nor do we think appellant Tibbits has established, by the evidence, any such contract as would create the relation of principal maker and surety between him and Campbell. Tibbits lived at Milwaukee, Wisconsin, and his name first appears on

the $35,000 note, made September 30, 1887. He had been many years a friend of Stevens. They had roomed together ten years and had kept up a social and business acquaintance from boyhood. When the $35,000 was borrowed, Stevens wired Tibbits that he was coming to see him, and on the evening of the 29th of September, 1887, he did go to Milwaukee to Tibbits' home. There they had a conversation, which Tibbits relates as follows: "He said Mr. B. H. Campbell is a rich man; is the president of the company and has offered to endorse for a large amount of money, in view of the collateral which he had, which would make the note good. He showed me the title to the collaterals, amounting to considerably more than the amount he required. Besides that, Campbell was a man worth some $300,000 or $400,000. Campbell's endorsement was on the note when I endorsed it. I endorsed the note that afternoon when Stevens came from Chicago, at the request of Stevens. Before that I had no conversation with Stevens in reference to the note." Witness had no conversation with Campbell in reference to this note of September 30, 1887, the first one signed by him, until it had matured.

The evidence shows that when Stevens borrowed this $35,000 he arranged for it for a year but gave his note for six months; that it was understood that it should be renewed or extended if he was not ready to pay it then. About the time it matured Stevens found that he would not be able to pay it and arranged to have it extended, and the new note was dated of the same date as the first note that was signed by Tibbits, and was for a year instead of six months. On February 15, 1888, Stevens sent the renewal note, of date September 30, 1887, for the $35,000, to Tibbits in a letter, in which he said: "Enclosed I send you my note for $35,000, one year from date. The note you and Mr. Campbell endorsed, it showed six months in it, and the last I made was for one year. Besides, I paid the brokerage for one year, and so am enti-

tled to the time. Mr. Campbell told me he would endorse
the year paper, and so I wish to ask you to do the same.
The same collateral is in the year note that was in the
six months note, and it is in every respect the same,
except the additional time. I will be greatly obliged if
you will do this."

Appellant Tibbits testified that he received the above
letter and the note enclosed; that he signed it and took
it to Chicago and delivered it to Stevens, and that he
and Stevens then went over to Campbell's office. Tib-
bits says: "I complained because his (Campbell's) name
was not on before mine. He then turned to me and said,
'Mr. Tibbits, don't be alarmed about that note; I will
take that note up and pay it myself; take the securities.'"
Campbell, at the time of this renewal, signed his name
under the name of appellant Tibbits. That note ran un-
til October, 1888, when it was again renewed for $35,000.
Of this note Tibbits says: "This note of October 1, 1888,
was a renewal of the note made by Stevens at the time
he requested me to endorse it. He spoke of having an
understanding; that it was agreed about, and he wanted
my endorsement. My recollection is that the names of
Sidney A. Stevens and B. H. Campbell were on the note
when I endorsed it. Mine was the other endorsement."

At the time of this renewal and endorsing there was
no conversation whatever between Tibbits and Camp-
bell. The note was again renewed January 1, 1890, and
all these parties signed it as endorsers or sureties, and
at that time there was no conversation between the vari-
ous parties who were sureties, but each of them signed
at the request of Stevens, the maker. The note was not
offered in evidence. It seems to have been lost or mis-
laid, and it is uncertain whether it was payable to Catlin
or to the order of Stevens; nor, except as an indistinct
memory on the part of those who signed it, was the man-
ner of the endorsements, or the order thereof, shown.

When the note executed on January 1, 1890, matured, Jamieson & Co., bankers, wrote the maker and all the endorsers, of date September 1, 1890: "We have for collection a note, date January 1, 1890, at six months, for $35,000, signed by Sidney A. Stevens, endorsed and guaranteed by B. H. Campbell, F. G. Tibbits and R. H. Tinker; collateral, [here giving list of collateral as described in note.] The note is past due and unpaid, and we have been instructed by the holder of same, Mr. T. D. Catlin, to demand payment of you." About the same time Stevens wrote the sureties, asking permission to sell a part of the collateral that was held for the note of January 1, 1890, and to apply the proceeds upon that note. Permission was granted and the sale was made, and the debt, on October 1, was reduced to $34,290.05. The parties did not pay this note of January, 1890, and were having difficulty about arranging for it, and Catlin was insisting upon payment and threatening suit, when Stevens, on October 1, 1890, wrote Tibbits: "Yesterday I saw Mr. Catlin, and he agreed to call off his dogs until October 15, if Mr. Campbell and you and Bob would become the makers of the note instead of endorsers and guarantees, as is the case now. The note will be made to my order and I endorse and guarantee it. This will put it off for one year and save just so much trouble. The reason for making this change is in appearance only, and not in fact. The guarantor is in fact the maker, only the other looks better and helps its sale. Please let me know when you come, and set time and place for meeting you." It is true, Tibbits says he was a mere endorser upon the note of January 1, 1890, but the letter from the bank and the letter from Sidney Stevens, both introduced in evidence by Tibbits, tend very strongly to show that he bore the relation of a guarantor.

This note remained unpaid until in November, when Stevens, Campbell, Tibbits and Tinker met at the office of Mr. Towne, in Chicago. Towne was the attorney for

Catlin and insisted upon immediate payment of the note, or proposed that if a change of the amount of collateral was added, variously stated from $20,000 to $30,000, and the parties would all become makers of a new note, six months more time would be given. All the parties were anxious for this extension, as none of them were in condition or ready to pay the note. Campbell said that he would put up $10,000 additional security, and Tibbits said that he had stock in a Mexican mine, on deposit in the Chicago Trust Company, and he was willing to put up twenty-five hundred shares of that, or if a sale was perfected which was then being negotiated, that he would put up $10,000 of the proceeds. Arrangements were finally made by which all of them did sign a note payable to Catlin six months after October 1, 1890, and Campbell did put up the additional $10,000 in stock. Tibbits was not called upon and did not put up the stock that he had proffered. Tibbits testified that at the meeting at Towne's office Catlin was there, and before the meeting he (Tibbits) had been to Campbell's office and had a conversation with Campbell, in which the latter said: "Well, I suppose we have got to obtain an extension of that note again. I can't make a change of my money affairs to take up that note now." Tibbits further says: "Stevens did not add to the encouragement at all. He said he was unable to pay it. Campbell said, 'I suppose Catlin will ask for some additional security.' I said, 'Mr. Campbell, I have no securities now that I could put up.' 'Well,' he says, 'I have told you, and I still maintain, that I will take care of that note—that you shall be free from it.' I said, 'How is that going to work? Now, we have got to settle this thing some way.' He said he would put up some additional security and get an additional extension, and by that time 'I will be able to make a turn.'" He says they then went to Towne's office, and he thinks Catlin was there, and that he had a conversation with Catlin and repeated to him what

Campbell had told him, and that Campbell had agreed to guarantee him against liability on the note. No other witness recollects of Catlin being present at that conversation, and there is very strong documentary evidence offered by Tibbits contradicting him in that regard. The testimony of both Tibbits and Tinker is, that at that conversation on November 24, when they were trying to arrange for the renewal of the note and to complete the execution of the note that is now in controversy, Towne said he would submit the matter to Mr. Catlin, and if it was satisfactory to him it would be accepted. If Mr. Catlin was present and took part in the transaction there could be no occasion for the remark that the matter would be submitted to him. He had his counsel there and the arrangement was being made, the additional security given and the change in the former note agreed upon and the note executed. And as contradicting Tibbits, is a letter dated November 25, 1890, which was the day after this meeting at Towne's office, in which Stevens wrote Tibbits: "I have only a moment in which to write. Mr. Catlin accepted the offer made yesterday by Mr. Campbell, and the note is extended for six months from October 1, and is due April 1. I shall now make every effort possible to sell my collateral and get the amount down to the figure we talked yesterday. Mr. Campbell paid Mr. Towne $200 to-day and wants to be reimbursed. This I should pay, but must have a little help at this time. Please send me one-third and I will write to Bob to do the same, and will in a little while pay him my one-third. He was very much gratified at your offer to send him a paper giving him the right to $10,000 of the amount received from the twenty-five hundred shares in escrow in the Chicago Trust Company."

It seems strange, indeed, if Mr. Catlin was present when this note was drawn up and this agreement was made, and with his attorney, that it should have to be delayed a day before it could be ascertained whether he

would accept the new note and the additional securities. Another circumstance tending to contradict Tibbits is a letter of November 24, 1890, the same day of the meeting, written by Stevens to his brother and introduced in evidence by appellant Tibbits, in which it is said: "Messrs. Campbell, Tibbits, Tinker and I met Mr. Towne at his office this morning. After considerable talk Mr. Towne, in view of the present stringency in the money market, said he would give a six months' extension of the Catlin claim if Campbell would put up $30,000 in security as additional collateral. This Mr. Campbell said he could not do. Then Mr. Towne reduced the amount to $20,000, and Mr. Campbell said he would put up $10,000 of this present stock, and that was the best he could do. Mr. Towne said he would submit it to Mr. Catlin."

By the letter of November 25, 1890, from Stevens, the maker, to Tibbits, Tibbits was expressly advised that Campbell, who he now claims was the principal maker of the note as to him, had paid $200 to Towne for his services as attorney in procuring the extension, and Stevens' proposition was that Tibbits, Stevens (the maker) and Tinker should each pay one-third of that $200 back to Campbell, thus leaving Campbell to pay no part of the $200 which he had advanced Towne. Tibbits testifies that he did send one-third of the $200 so called for by that letter to be paid back to Campbell. There is no possible way of reconciling Tibbits' conduct, then, with his present contention that Campbell was the principal maker of the note as to him, and had agreed to take care of the note and protect himself with the collateral securities. The most natural thing for Tibbits to have done, if his present contention had been correct, and when the parties were all alive, would have been to have written both Stevens and Campbell declining to pay any part of it, and reminding Campbell of his undertaking to save him harmless in the transaction.

Assuming, however, that Catlin was present at the meeting when the note was drawn up and that Tibbits did have a conversation with him, as asserted, we are still unable to say that, within the meaning of the statute, there was anything that took place between Tibbits and Campbell, or that was communicated from Tibbits to Catlin, that would make Campbell a principal maker of the note. The statutory requirement is: "Whenever the principal maker of any note * * * shall die," etc. The term "principal maker" of a note, within the meaning and intention of that statute, would seem to be the person who would have been the party to the note had there been no sureties or endorsers. In other words, he would be presumed to be the person who received the consideration for making the note, and in a case where it is made for money loaned, it would ordinarily be the person who borrowed the money. It is true, there may be more than one principal maker to a note. Two persons might borrow the money, but ordinarily that does not occur unless the persons bear the relationship of partners. It is unusual for two persons to borrow a sum of money and undertake in some manner to divide the money between themselves and each of them be a principal maker upon the note; but such transaction might be had, and if it were, those borrowing the money would, as the term is commonly understood, be the principal makers of the note. But we are unable to concur in the contention that a number of sureties may, by arrangement between themselves, constitute each but the last, with reference to all the others, a principal maker of a note. We are unable to admit the contention that there could be a parol agreement by which Campbell was a principal maker as to Tibbits and Tinker, and that Tibbits and Tinker could make a parol agreement by which Tibbits could be a principal maker as to Tinker, and that each of these oral contracts could be communicated to Catlin, the holder, and he would be required, under this

statute, to follow the estates of each in the order named, in case of death, or lose his debt or release the sureties.

In the construction of statutes, terms and expressions there used are given their ordinary and common significance, and to hold that the term "principal maker" means just any party to a note who by some oral and extraneous agreement bears a different relation to the note than another, or bears a relation by which, as to some other, he becomes first bound for the debt or would be deprived of his right of contribution in case he should pay the note,—to hold such as these to be principal makers, within the meaning of the statute, would be to stretch terms, and give the expression "principal maker" a meaning that would add great uncertainty to commercial paper, and leave the holder thereof in a condition that he could seldom know, if there were sureties on it, what his rights were.

It is further urged that, these notes being renewals, one of the other, the relation of these parties was fixed by their first undertaking upon the first note, and that the subsequent changes did not change their obligation or their relation to each other. In other words, as we understand the contention, it is, that, inasmuch as the first note was made payable to the order of Sidney Stevens, and B. H. Campbell endorsed the note, and Tibbits became the next endorser, and Tinker the next, by the contract of endorsement Campbell stands simply as a first endorser, and is bound to hold both Tibbits and Tinker harmless and pay the note. One difficulty with this contention is that Tinker was not upon the first note signed by Tibbits, and there are many more reasons for rejecting the conclusion here contended for. Several of these notes were made payable to specific persons, and by the endorsement on the back thereof by Tibbits, Tinker and Campbell, they became guarantors and not mere endorsers. (*Blatchford* v. *Milliken*, 35 Ill. 434.) It is not even shown by the evidence how the note of date Janu-

ary 1, 1890, read, or to whom it was payable. It is true, that if a note be made payable to the order of the maker and be endorsed before delivery, such obligation is that of simple endorser. (*Blatchford* v. *Milliken, supra.*) It is also the rule in this State, that if a note is payable to a specific person all endorsers become guarantors for the payment, and there is no question, under the evidence in this case, but what these parties bore both of these relations, at various times, upon the notes in this series. But that contention, it seems to us, must fall within the reasoning of the other contention, that, even conceding the position taken by appellants, that ordinarily where notes are renewed for the same debt the persons who are endorsers stand in the same relation that they did at the first, no such arrangement as that could make, nor could the application of such rule make, such persons, or any of them, principal makers of the note within the meaning of the statute, or place an additional obligation upon the holder of the note, by virtue of our statute, than would arise ordinarily between maker and surety. Furthermore, it must also be borne in mind that Tibbits had signed two of this series of notes before he ever saw Campbell, and at the time he claims that Campbell agreed to save him harmless he was already on the note and the note in the hands of Stevens for negotiation. There is no pretense that he paid Campbell any consideration for this contract of indemnity, or that such contract did in any manner induce him to sign the note that he had already signed. But whatever the relation of these parties may have been to this series of notes up to the time of giving the last note, it cannot be seriously contended that it was not within their power to change their relation and assume a new relation in regard to it, if they saw fit to do so. These parties were all notified, when the note of January 1, 1890, matured, and before and at the time the note in question was made, that they were to change their relation toward the holder and payee of

that note, and were, as to him, all become makers instead of endorsers or guarantors, and were, in addition thereto, required to give further collateral security, and this they did, as evidenced by the signing of the note and as shown by the undisputed testimony.  This was a new contract made between all the parties advisedly, and was expressly understood by all of them as the condition upon which a further extension of payment of the debt would be made, and the extension of the time of payment was a sufficient consideration for the new relation.  Under such state of the case we are unable to yield to the contention that these parties, so far as Catlin, the holder of the note is concerned, bore any other or different relation to it than that ordinarily held by makers of notes. It is true, they could show that they were sureties and that Stevens was the principal maker, and if they could have shown that Catlin, the payee, did anything that, under the law, would release a surety, they had a right to show that,—and such was one of the allegations of the bill, that Catlin had released, and had agreed to release, Campbell and his estate.  The allegation was imperfectly and badly made and was wholly lacking in proof, and was abandoned.

The views expressed herein above make it unnecessary to go into the discussion of the liability of appellants on the appeal bond.  Their contention in their bill and argument is, that the appeal bonds are mere incidents to the judgment, and if the court should set the judgments aside the right of recovery on the bonds would be lost and their collection should be enjoined.

We think the circuit court properly dismissed appellants' bill, and the judgment of the Appellate Court affirming that action is affirmed.

*Judgment affirmed.*